UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION

| | |
|---|---|
| KALEHA Y., <br><br>           Plaintiff, <br><br> v. <br><br> FRANK BISIGNANO, Commissioner of the Social Security Administration, <br><br>           Defendant. | **MEMORANDUM DECISION AND ORDER AFFIRMING THE COMMISSIONER'S DECISION DENYING DISABILITY BENEFITS** <br><br> Case No. 2:25-cv-00253 <br><br> Magistrate Judge Daphne A. Oberg |

Kaleha Y.[1] brought this action for judicial review of the termination of her disability insurance benefits by the Commissioner of the Social Security Administration.[2] The administrative law judge (ALJ) who reviewed her continuing eligibility determined she no longer qualified as disabled.[3] Ms. Y. raises claims of error relating to the vocational expert's testimony and the ALJ's conclusion that she could perform work in the national economy.[4] As explained below, the ALJ applied the correct legal

---

[1] Pursuant to best practices in the District of Utah addressing privacy concerns in judicial opinions in certain cases, including social security cases, the plaintiff is referred to by first name and last initial only.

[2] (*See* Compl., Doc. No. 2.)

[3] (Certified Tr. of Admin. R. (Tr.) 17–31, Doc. No. 8.)

[4] (*See* Opening Br., Doc. No. 12 at 1, 3.) Because the opening brief contains inconsistent page numbering, citations to this document reference the CM/ECF pagination.

standards, and substantial evidence supports his findings.  Accordingly, the

Commissioner's decision is affirmed.[5]

## STANDARD OF REVIEW

Section 405(g) of Title 42 of the United States Code provides for judicial review

of the Commissioner's final decision.  This court reviews the ALJ's decision to

determine whether substantial evidence supports his factual findings and whether he

applied the correct legal standards.[6]  "[F]ailure to apply the correct legal standard or to

provide this court with a sufficient basis to determine that appropriate legal principles

have been followed is grounds for reversal."[7]

An ALJ's factual findings are "conclusive if supported by substantial evidence."[8]

Although the evidentiary sufficiency threshold for substantial evidence is "not high," it is

"more than a mere scintilla."[9]  Substantial evidence is "such relevant evidence as a

reasonable mind might accept as adequate to support a conclusion."[10]  "The possibility

of drawing two inconsistent conclusions from the evidence does not prevent an

---

[5] The parties consented to proceed before a magistrate judge in accordance with 28 U.S.C. § 636(c) and Rule 73 of the Federal Rules of Civil Procedure.  (Doc. No. 6.)

[6] *See* 42 U.S.C. § 405(g); *Lax v. Astrue*, 489 F.3d 1080, 1084 (10th Cir. 2007).

[7] *Jensen v. Barnhart*, 436 F.3d 1163, 1165 (10th Cir. 2005) (citation omitted).

[8] *Biestek v. Berryhill*, 587 U.S. 97, 102 (2019) (internal quotation marks omitted).

[9] *Id.* at 103 (citation omitted).

[10] *Id.* (citation omitted).

administrative agency's findings from being supported by substantial evidence."[11]  And the court may not reweigh the evidence or substitute its judgment for that of the ALJ.[12]

### APPLICABLE LAW

The Social Security Act defines "disability" as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment" expected to result in death or last for at least twelve consecutive months.[13] An individual is considered disabled only if her impairments are so severe, she cannot perform her past work or "any other kind of substantial gainful work."[14]

A recipient's continued entitlement to disability insurance benefits must be reviewed periodically.[15]  In determining whether benefits should be terminated, the ALJ uses an eight-step sequential evaluation.[16]  The burden in termination cases rests with the Commissioner at each step.[17]  If the ALJ finds the recipient unable to engage in substantial gainful activity at any point, he will not proceed through the remaining steps.[18]

---

[11] *Lax*, 489 F.3d at 1084 (citation omitted).

[12] *Langley v. Barnhart*, 373 F.3d 1116, 1118 (10th Cir. 2004).

[13] 42 U.S.C. § 423(d)(1)(A).

[14] *Id.* § 423(d)(2)(A).

[15] 20 C.F.R. § 404.1594(a).

[16] *Id.* § 404.1594(f)(1)–(8); *Hayden v. Barnhart*, 374 F.3d 986, 988 (10th Cir. 2004).

[17] *Hayden*, 374 F.3d at 991.

[18] 20 C.F.R. § 404.1594(f).

As relevant here, at steps three and four, the ALJ determines whether the recipient's prior impairments have medically improved and whether the improvement relates to the recipient's ability to work.[19]  At step six, the ALJ considers whether all the recipient's current impairments, in combination, are severe.[20]  At step seven, the ALJ assesses the recipient's current residual functional capacity based on all her current impairments and considers whether she can do past work.[21]  At step eight, the ALJ considers whether the recipient can do other work, given her residual functional capacity, age, education, and work experience.[22]  If the recipient can do other work, the ALJ will find her disability has ended.[23]

## PROCEDURAL HISTORY

Ms. Y. applied for disability insurance benefits under Title II of the Social Security Act[24] in April 2015.[25]  She alleged she became disabled due to neck and back pain

---

[19] *Id.* § 404.1594(f)(3)–(4).  At steps one and two, the ALJ determines whether the recipient is engaged in substantial gainful activity and whether her impairments are equivalent to an impairment precluding substantial gainful activity (listed in the appendix of the relevant disability regulation).  *Id.* § 404.1594(f)(1)–(2).  These steps are not challenged in this case.  Step five is also not at issue; it applies only if the ALJ finds no medical improvement (at step three) or improvement unrelated to an ability to work (at step four).  *See id.* § 404.1594(f)(5).

[20] *Id.* § 404.1594(f)(6).

[21] *Id.* § 404.1594(f)(7).

[22] *Id.* § 404.1594(f)(8).

[23] *Id.*

[24] 42 U.S.C. §§ 401–434.

[25] (Tr. 255–61.)

following a car accident.[26]  In a July 2018 decision, an ALJ found Ms. Y disabled.[27]  But the ALJ noted medical improvement was expected with recommended treatment, and he suggested a continuing disability review in twenty-four months.[28]

In June 2021, the agency conducted a review and determined Ms. Y. was no longer disabled.[29]  This decision was upheld on reconsideration, and Ms. Y. requested a hearing before an ALJ.[30]  After an administrative hearing,[31] the ALJ issued a decision finding Ms. Y.'s disability ended in June 2021.[32]

As relevant here, at steps three and four of the sequential evaluation, the ALJ found Ms. Y. experienced medical improvement relating to her ability to work as of June 2021.[33]  The ALJ noted Ms. Y.'s impairments at the time of the prior decision were obesity and a spine disorder.[34]  At that time, she had the residual functional capacity to perform a reduced range of sedentary work; she could stand or walk for about two hours total in an eight-hour workday, and she needed unscheduled twenty-minute

---

[26] (*See* Tr. 84–85, 1008.)

[27] (Tr. 97–105.)

[28] (Tr. 105.)

[29] (Tr. 106, 158–61.)

[30] (Tr. 135, 187–200, 202–03, 208.)

[31] (Tr. 39–75.)

[32] (Tr. 17–31.)

[33] (Tr. 21, 29.)

[34] (Tr. 19.)

breaks every ninety minutes.[35]  The ALJ determined Ms. Y.'s impairments had improved since the prior decision because evidence "no longer show[ed] an antalgic presentation, moderate discomfort, guarded movements, or weakness in the bilateral upper and lower extremities."[36]  He also noted Ms. Y. testified she "liv[ed] alone for 13 weeks at a time and [] had [an] improved ability to walk."[37]

At step six, the ALJ found Ms. Y.'s current severe impairments (since June 2021) were sarcoidosis, chronic pain syndrome, unspecified depressive disorder, and unspecified anxiety disorder.[38]  The ALJ found Ms. Y. also had nonsevere impairments of "a skin condition such as boils and hidradenitis supperative."[39]  At step seven, the ALJ found that, since June 2021, Ms. Y. had the residual functional capacity to perform light work with additional limitations:

> [S]he can occasionally climb ramps and stairs; she can never climb ladders, ropes, and scaffolds; she can frequently balance, kneel, and crouch; she can occasionally stoop; she can never crawl; she can occasionally reach overhead bilaterally; she can never be exposed to hazards such as unrestricted heights and dangerous moving machinery; she can occasionally be exposed to extreme pulmonary irritants; due to reports of physical pain and mental limits, she can perform simple, goal-oriented but not assembly line paced work; she can occasionally interact with

---

[35] (*Id.*)

[36] (Tr. 24.)

[37] (*Id.*)

[38] (Tr. 19.)

[39] (*Id.*)  The ALJ also found Ms. Y.'s alleged post-traumatic stress disorder was not medically determinable.  (*Id.*)  That finding is not challenged on appeal.

co-workers, supervisors, and the general public; and she can adapt to routine changes in the workplace.[40]

Based on this residual functional capacity assessment and the testimony of a vocational expert, the ALJ determined Ms. Y. could not perform past work.[41]  But at step eight, based on the expert's testimony, the ALJ found Ms. Y. capable of three other jobs in the national economy: office helper, mail clerk, and housekeeper cleaner.[42]  Accordingly, the ALJ found Ms. Y.'s disability ended in June 2021.[43]  This decision became final when the Appeals Council denied Ms. Y.'s request for review.[44]

## ANALYSIS

Ms. Y.'s claims of error are somewhat difficult to discern, but she primarily appears to challenge the vocational expert's testimony and the ALJ's step-eight finding that she could perform other jobs in the national economy.[45]  While Ms. Y. frames her arguments around the step-eight determination, some arguments also appear to implicate the residual functional capacity (RFC) determination.  The issues which can be fairly gleaned from Ms. Y.'s briefing are addressed in turn below.

---

[40] (Tr. 24.)

[41] (Tr. 29–30.)

[42] (Tr. 30–31.)

[43] (Tr. 31.)

[44] (Tr. 1–3.)

[45] (*See* Opening Br., Doc. No. 12 at 1, 3.)

7

### A. Vocational Expert's Impartiality

Ms. Y. first "questions the independence of [the] vocational expert . . . due to her hesitant testimony, which minimized the effect of hypothetical extreme limitations on jobs."[46]  Ms. Y. asserts the vocational expert "answered circumspectly" when Ms. Y.'s attorney asked the expert about "the effect of [Ms. Y.'s] symptoms resulting from her neck impairment."[47]  As explained below, Ms. Y. has identified no valid basis to doubt the vocational expert's impartiality.

Vocational experts are "vocational professionals who provide impartial expert opinion" during ALJ hearings.[48]  Agency policy prohibits off-the-record discussion between an ALJ and a vocational expert, and prohibits an ALJ from using an expert who has had "prior professional contact with the claimant."[49]  Ms. Y. does not allege either of these circumstances; instead, based solely on the expert's cross-examination responses, she suggests the expert was not impartial.  This accusation is unfounded.

During the hearing, the ALJ asked Ms. Y.'s attorney if he objected to the specific vocational expert testifying in that capacity.[50]  Ms. Y.'s attorney stated he had no objections, noting he "saw her vitae" and had seen her testify before.[51]  The ALJ then

---

[46] (*Id.* at 3.)

[47] (*Id.* at 12 (footnote omitted).)

[48] SSR 96-9p, 1996 SSR LEXIS 6, at *27 n.8 (July 2, 1996).

[49] Program Operations Manual System (POMS) HA 01250.048.

[50] (Tr. 66.)

[51] (*Id.*)

posed a hypothetical RFC to the vocational expert which substantially matched the RFC he ultimately assessed.[52]  The vocational expert testified a person with that RFC and Ms. Y.'s vocational profile could perform three jobs in the national economy: office helper, mail clerk, and cleaner-housekeeper.[53]  The vocational expert identified the number of jobs available nationally for each position as 43,000 for office helper, 44,000 for mail clerk, and 390,000 for cleaner-housekeeper.[54]

Ms. Y.'s attorney then cross-examined the expert about how various additional limitations would affect her testimony.[55]  As relevant here, the attorney asked the expert whether Ms. Y.'s ability to work as an office helper or mail clerk would be affected if she could only look down for five minutes at a time.[56]  The expert responded "potentially, yes" but indicated she was "not a hundred percent positive," explaining it depended on "what specific tasks might be required" by a setting and employer.[57]  When Ms. Y.'s

---

[52] (Tr. 24, 66–67.)  Ms. Y. notes the hypothetical RFC posed to the expert included a limitation of occasional exposure to "pulmonary irritants," (Tr. 67), but the ALJ's ultimate RFC determination included a limitation of occasional exposure to "*extreme* pulmonary irritants," (Tr. 24 (emphasis added)).  But Ms. Y. does not claim error based on this discrepancy.  Rather, she argues the pulmonary irritants limitation in both the hypothetical and assessed RFCs are inconsistent with an opinion from her treating physician and occupational data from the Bureau of Labor Statistics.  (*See* Opening Br., Doc. No. 12 at 26.)  Those arguments are addressed separately below.

[53] (Tr. 67.)

[54] (*Id.*)

[55] (Tr. 68–73.)

[56] (Tr. 69.)

[57] (*Id.*)

attorney asked whether the expert was referring to accommodations, the expert said "not necessarily" and reiterated that it would depend on the "specific tasks for each position."[58]  She explained: "There are positions where an individual is working on a keyboard looking at a screen that's a neutral position, particularly in the Office Helper position."[59]  She also explained the mail clerk job sometimes involved "walking around, passing out the mail and so they're not necessarily . . . looking down."[60]  She testified a limitation of looking down for no more than five minutes would erode the number of jobs available nationally for those two positions by fifty percent.[61]  Ms. Y.'s attorney later asked if the mail clerk job would be eliminated if it required looking down to sort the mail before distributing it, but a person was unable to do that "within a reasonable timeframe."[62]  The vocational expert responded: "[I]f an individual is not performing what is required in any position, yes, I believe that potentially could lead to the inability to sustain that particular position."[63]

Nothing in this exchange suggests the vocational expert was not impartial.  The fact that, at times, she indicated she was unsure or gave equivocal answers does not demonstrate a lack of objectivity.  There is no indication any lack of certainty resulted

---

[58] (Tr. 70.)

[59] (Tr. 71.)

[60] (*Id.*)

[61] (*Id.*)

[62] (Tr. 72–73.)

[63] (Tr. 73.)

from the expert's attempt to evade the question, for example, as opposed to her thoughtful intellectual honesty.  The expert responded to all the attorney's questions and explained her responses.  And she ultimately offered a specific opinion regarding the erosion of the job base resulting from the limitation Ms. Y.'s attorney specified.  Ms. Y. offers no authority supporting her position that the vocational expert's responses suggest a lack of impartiality.  There is simply no basis to question the expert's objectivity on this record.

### B.  Limitation Relating to Head Movement

In discussing the expert's cross-examination, Ms. Y. asserts the ALJ "did not accept any limitation on the movement of [her] head even though he accepted Dr. Ingebr[e]tsen's findings" that she had reduced range of motion of her neck and moved her neck to protect it from pain.[64]  This is effectively a challenge to the ALJ's RFC determination—specifically, the omission of any limitation relating to head movement.

A claimant's RFC reflects the most she can do in a work setting considering her limitations.[65]  In assessing RFC, the ALJ considers "the extent to which an individual's medically determinable impairment(s), including any related symptoms, such as pain, may cause physical or mental limitations or restrictions that may affect his or her

---

[64] (Opening Br., Doc. No. 12 at 14–15.)

[65] *See* 20 C.F.R. § 404.1545(a)(1); SSR 96-8p, 1996 SSR LEXIS 5, at *1–2 (July 2, 1996).

capacity to do work-related physical and mental activities."[66]  The ALJ considers all relevant evidence in the record.[67]

Ms. Y. has demonstrated no error in the ALJ's omission of a limitation relating to head movement from the RFC determination.  The ALJ discussed the report provided by the consultative examiner, Dr. Ingebretsen, in the portion of the decision addressing medical improvement.[68]  The ALJ acknowledged Dr. Ingebretsen's observations that Ms. Y. had "reduction in the range of motion of her neck, did not have tenderness to touch in her neck, did not have neurological signs, and moved her neck to protect it [from] pain."[69]  The ALJ accurately noted Dr. Ingebretsen "did not note any specific functional limitations" and instead "relayed only his observations during the examination."[70]  Therefore, the ALJ accorded the opinion "little weight."[71]

In other words, the ALJ did not simply accept Dr. Ingebretsen's findings, as Ms. Y. asserts.  Rather, the ALJ accorded the report little weight because it did not contain opinions regarding specific functional limitations.  Notably, Dr. Ingebretsen did not provide any opinion regarding specific limitations in Ms. Y.'s ability to move her head

---

[66] SSR 96-8p, 1996 SSR LEXIS 5, at *5.

[67] *See* 20 C.F.R. § 404.1545(a)(3).

[68] (Tr. 24, 1139–43.)

[69] (Tr. 24 (citing Tr. 1142); *see also* Tr. 23 (describing the consultative examination findings).)

[70] (Tr. 24.)

[71] (*Id.*)

during a workday.  He did not, for example, opine she could only look down for five minutes (the limitation Ms. Y.'s attorney suggested during vocational expert's cross-examination).  And Ms. Y. identifies no other medical opinion or evidence supporting a specific limitation relating to head movement.

In assessing Ms. Y.'s RFC, the ALJ considered Ms. Y.'s reports of neck pain but referred to several treatment records indicating she had normal range of motion.[72]  He also noted her daily activities included performing household chores like laundry, dishes, and simple cooking; taking care of three cats (including managing their litter box); and taking care of a dog.[73]  The ALJ explained he accounted for Ms. Y.'s chronic pain in the RFC assessment by "limiting her lifting, carrying, postural, and environmental activities."[74]  The ALJ cited more than a "mere scintilla"[75] of evidence; substantial evidence supports the RFC assessment.  Accordingly, the ALJ did not err in omitting limitations on head movement from the RFC determination.

---

[72] (*See* Tr. 26 (citing Tr. 1239–40, 1335–36, 1350, 1370, 1626).)

[73] (Tr. 25.)

[74] (Tr. 29.)

[75] *Biestek*, 587 U.S. at 103.

C. <u>Treating Physician's Opinion</u>

Ms. Y. next argues the ALJ erred in finding she could perform the housekeeping cleaner job because the job's requirements are inconsistent with her treating physician's opinion (Dr. Doose).[76]  Ms. Y. contends the ALJ improperly rejected this opinion.[77]

Though framed as a challenge to the ALJ's step-eight finding, Ms. Y's argument is really a challenge to the RFC determination.  The vocational expert testified Ms. Y. could perform the housekeeping cleaner job, based on a hypothetical RFC substantially consistent with the ALJ's ultimate RFC determination.[78]  But Ms. Y. essentially argues the ALJ should have found her RFC more limited due to Dr. Doose's opinion.  As explained below, Ms. Y. has demonstrated no error in the ALJ's rejection of Dr. Doose's opined limitations.

1.  *Legal Standards*

Because Ms. Y. filed her claim for disability insurance benefits before March 27, 2017, the regulations in 20 C.F.R. § 404.1527 govern the ALJ's consideration of medical opinion evidence.[79]  Under this framework, the ALJ must consider "all the

---

[76] (Opening Br., Doc. No. 12 at 24–25.)

[77] (*Id.*)

[78] (Tr. 24, 66–67.)  As noted, there was a discrepancy between the pulmonary irritants limitation in the hypothetical RFC and the ultimate RFC determination, but Ms. Y. does not claim error based on this discrepancy.

[79] The Social Security Administration revised its rules regarding the evaluation of treating physician opinions for claims filed on or after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Med. Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017) (technical errors corrected by 82 Fed. Reg. 15132 (Mar. 27, 2017)).

medical opinions in the record" and "discuss the weight he assigns to such opinions."[80] The ALJ must give a treating physician's medical opinion "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record."[81] This analysis is sequential, meaning "if the opinion is deficient in either of these respects, then it is not entitled to controlling weight."[82] While an express finding with respect to this first question was once considered mandatory, the Tenth Circuit has since declined to remand where it could determine from the ALJ's decision that the ALJ "implicitly declined to give the opinion controlling weight."[83]

If the ALJ does not give a treating source opinion controlling weight, the ALJ must consider the level of deference to give it, using the factors in 20 C.F.R. § 404.1527(c). These factors include:

> (1) the length of the treatment relationship and the frequency of examination; (2) the nature and extent of the treatment relationship, including the treatment provided and the kind of examination or testing performed; (3) the degree to which the physician's opinion is supported by relevant evidence; (4) consistency between the opinion and the record as a whole; (5) whether or not the physician is a specialist in the area upon which

---

[80] *Keyes-Zachary v. Astrue*, 695 F.3d 1156, 1161 (10th Cir. 2012); *see also* 20 C.F.R. § 404.1527(c) (requiring the ALJ to evaluate every medical opinion and listing the factors to be considered in assigning weight to a medical opinion).

[81] 20 C.F.R. § 404.1527(c)(2).

[82] *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).

[83] *Mays v. Colvin*, 739 F.3d 569, 575 (10th Cir. 2014).

an opinion is rendered; and (6) other factors brought to the ALJ's attention which tend to support or contradict the opinion.[84]

ALJs use the same factors to determine the weight to give medical opinions from non-treating sources.[85]  The ALJ need not "apply expressly each of the six relevant factors in deciding what weight to give a medical opinion."[86]  But the ALJ must "give good reasons" for the weight assigned to a treating source's medical opinion.[87]

### 2.  Analysis

As relevant here, Dr. Doose opined Ms. Y. could stand for a maximum of thirty minutes in a four-hour workday—for a total of one hour in an eight-hour workday.[88]  She opined Ms. Y. could never work around dangerous equipment; could only occasionally use her hands for reaching, handling, and fingering; and could never be around "dust, smoke, or fumes exposure."[89]  And she opined Ms. Y. would frequently need to elevate her legs during the day.[90]  (Ms. Y. contends these opined limitations are inconsistent

---

[84] *Watkins*, 350 F.3d at 1301 (citation omitted).

[85] 20 C.F.R. § 404.1527(c).

[86] *Oldham v. Astrue*, 509 F.3d 1254, 1258 (10th Cir. 2007).

[87] *Doyal v. Barnhart*, 331 F.3d 758, 762 (10th Cir. 2003) (citation omitted); 20 C.F.R. § 404.1527(c)(2).

[88] (Tr. 1834.)

[89] (Tr. 1834–35.)

[90] (Tr. 1835.)

16

with the housekeeping cleaner job.)[91]  Dr. Doose included the following statement in the

"comments" section of the opinion form:

> There are limitations to this medical statement.  The above is opinion only and not a formal functional capacity evaluation.  A formal evaluation would be more useful to determine true limitations as I don't have the ability to actually test these questions in a primary care appointment.[92]

The ALJ considered Dr. Doose's opinion and accorded it "little weight."[93]  He

acknowledged Dr. Doose was a medical doctor and Ms. Y.'s treating provider.[94]  But he

noted Dr. Doose herself indicated her opinion had limitations.[95]  As the ALJ observed,

she provided "little explanation as to how [she] arrived at her conclusions."[96]  Citing

cases from the Eighth and Ninth Circuits, he explained "[o]pinions rendered on form

reports which do not contain significant explanation of the basis for conclusions may

appropriately be accorded little or no weight."[97]  Ultimately, the ALJ found Dr. Doose's

opinions were "not an accurate reflection of [Ms. Y.'s] functional limitation[s] as they

appear [to be] based on [Ms. Y.'s] own subjective reports and Dr. Doose herself

---

[91] (Opening Br., Doc. No. 12 at 24.)

[92] (Tr. 1835.)

[93] (Tr. 28–29.)

[94] (Tr. 28.)

[95] (*Id.*)

[96] (*Id.*)

[97] (*Id.* (citing *Crane v. Shalala*, 76 F.3d 251, 253 (9th Cir. 1996); *Johnson v. Chater*, 87 F.3d 1015, 1018 (8th Cir. 1996)).)

admitted that a formal functional capacity [evaluation] was needed to determine [Ms. Y.'s] true limitations."[98]

Ms. Y. has demonstrated no error in the ALJ's evaluation of Dr. Doose's opinion. It is apparent the ALJ implicitly declined to give the opinion controlling weight. And he provided valid reasons for doing so, noting Dr. Doose's acknowledgment that she did not base the opinion on a formal evaluation and the scant explanation she provided.[99] In other words, the opinion was not "well-supported by medically acceptable clinical and laboratory diagnostic techniques," as required to be entitled to controlling weight.[100] Likewise, the ALJ gave good reasons for according the opinion little weight: the lack of supporting explanation, the fact that the opined limitations seemed to be based on Ms. Y.'s subjective reports, and Dr. Doose's recognition that a formal evaluation was needed to determine Ms. Y.'s "true limitations."[101] The ALJ's explanation makes clear he considered the relevant factors, including the nature of the treatment relationship and the kind of examination or testing performed (factor two), and supportability of the opinion (factor three).

---

[98] (Tr. 28–29.)

[99] (*See id.*)

[100] 20 C.F.R. § 404.1527(c)(2).

[101] (Tr. 28–29); *see also Akers v. Colvin*, 556 F. App'x 754, 757 (10th Cir. 2014) (unpublished) (finding an ALJ was entitled to give a doctor's opinion little weight where it "relied quite heavily on [the claimant's] subjective complaints and provided little or no explanation of the basis of her conclusions"); *Bernal v. Bowen*, 851 F.2d 297, 301 (10th Cir. 1988) (holding "a treating physician's opinion may be rejected if it is brief, conclusory and unsupported by medical evidence").

Ms. Y. suggests the ALJ improperly rejected Dr. Doose's opinion based on an erroneous determination that it addressed issues reserved to the Commissioner.[102]  But the ALJ made no such determination; this was not among the reasons the ALJ gave for rejecting Dr. Doose's opinion.  There is no basis to conclude the ALJ rejected Dr. Doose's opinion for this reason.  Ms. Y. also protests that the ALJ cited out-of-circuit cases in evaluating Dr. Doose's opinion.[103]  But Tenth Circuit decisions also support the proposition for which the ALJ cited these cases: that conclusory opinions lacking supporting explanations may be given little weight.[104]  Ms. Y. does not allege any other error in the ALJ's evaluation.  Because the ALJ applied the correct legal standards and provided valid, supported reasons for giving Dr. Doose's opinion little weight, the ALJ did not err in rejecting Dr. Doose's opined limitations.

D. Inconsistencies With Occupational Data Sources Other than the DOT

Ms. Y. next argues the ALJ's findings regarding her ability to perform the three identified jobs—and the number of such jobs available nationally—are inconsistent with job data from sources other than the Dictionary of Occupational Titles (DOT). Specifically, she argues:

- her limitation to occasional interaction with coworkers, supervisors, and the public is inconsistent with the requirements for the office helper and

---

[102] (Opening Br., Doc. No. 12 at 25.)

[103] (*Id.* at 24.)

[104] *See, e.g.*, *Akers*, 556 F. App'x at 757; *Bernal*, 851 F.2d at 301.

housekeeping cleaner jobs as described in the Department of Labor's Occupational Information Network (O*NET);[105]

- her limitation to occasional exposure to pulmonary irritants (or extreme pulmonary irritants) is inconsistent with research from the U.S. Bureau of Labor Statistics regarding housekeeping cleaners' exposure to irritants;[106]

- the vocational expert's testimony regarding the number of office helper and housekeeping cleaner jobs available nationally is inconsistent with data from Skilltran (an occupational database) and the U.S. Bureau of Labor Statistics.[107]

Ms. Y.'s arguments based on these other data sources are unavailing.

An ALJ may not rely on evidence from a vocational expert to support a finding of nondisability unless the ALJ asks the expert "how his or her testimony as to the exertional requirement of identified jobs corresponds with the Dictionary of Occupational Titles, and elicit[s] a reasonable explanation for any discrepancy on this point."[108]  In other words, if the vocational expert's testimony "appears to conflict with the DOT" or its companion publication, the Selected Characteristics of Occupations (SCO), the ALJ

---

[105] (Opening Br., Doc. No. 12 at 16, 26.)

[106] (*Id.* at 26.)

[107] (*Id.* at 16–19.)

[108] *Haddock v. Apfel*, 196 F.3d 1084, 1087 (10th Cir. 1999)*.*

must "obtain a reasonable explanation for the apparent conflict."[109]  But Ms. Y. has cited

no authority requiring an ALJ to explore or resolve conflicts with other data sources.[110]

Indeed, courts have rejected similar arguments based on purported conflicts with data

sources other than the DOT or SCO.[111]

Here, the vocational expert expressly referred to the DOT in identifying the three

jobs at issue, and she confirmed her testimony was consistent with the DOT and

companion publications.[112]  The expert also based her testimony regarding issues not

addressed in the DOT or SCO—including "overhead reaching versus other reaching,

---

[109] SSR 00-4p, 2000 SSR LEXIS 8, at *9 (Dec. 4, 2000).  SSR 00-4p was rescinded effective January 6, 2025.  *See* SSR 24-3p, 2025 SSR LEXIS 1 (Jan. 6, 2025) (rescinding and replacing SSR 00-4p).  However, a reviewing court should apply SSR 00-4p if it remained in effect at the time of the ALJ's decision, as was the case here. *See id.* at *1 n.1.

[110] Ms. Y. cites SSR 24-3p, (*see* Opening Br., Doc. No. 12 at 9–11), but that policy is inapplicable because it was not in effect at the time of the ALJ's decision.  *See* SSR 24-3p, 2025 SSR LEXIS 1, at *1 n.1.  And while SSR 24-3p *permits* vocational experts to rely on sources other than the DOT, it does not *require* them to do so.  *See id.* at *7 (stating vocational experts "may provide evidence based on their professional experience and any reliable source of occupational information that is commonly used in the vocational profession and relevant under our rules").  Further, SSR 24-3p states a claimant's attorney is expected to "raise any relevant questions or challenges about the [vocational expert's] testimony at the time of the hearing."  *Id.* at *8.  Here, Ms. Y.'s attorney did not raise any questions or challenges based on other data sources at the time of the hearing.

[111] *See Anders v. Berryhill*, 688 F. App'x 514, 523 (10th Cir. 2017) (unpublished) (rejecting challenge to vocational expert's testimony based on printouts from Job Browser Pro (also known as Skilltran)); *Aragon v. Kijakazi*, No. 21-97, 2023 U.S. Dist. LEXIS 24737, at *54–56 (D.N.M. Feb. 14, 2023) (unpublished) (rejecting argument that an ALJ had a duty to consider purported conflicts between a vocational expert's testimony and O*NET).

[112] (Tr. 67–68.)

working with people, [being] off task and absenteeism"—on her background and experience.[113]  At the hearing, Ms. Y.'s attorney did not question the expert about this testimony or ask her about any other data sources.[114]  Further, Ms. Y. did not submit the job data she now relies on to the ALJ, even though the ALJ left the record open after the hearing.[115]  Because the ALJ was not required to consider other occupational data sources or explore any conflict with sources other than the DOT, Ms. Y. has shown no error based on other occupational data sources.

E.  Inconsistency with the DOT

Finally, Ms. Y. contends her limitation to "simple" work is inconsistent with the DOT's requirements for the mail clerk job.[116]  The DOT requires level-three reasoning ability for this job.[117]  Ms. Y. cites *Hackett v. Barnhart*,[118] a case in which the Tenth

---

[113] (Tr. 68.)

[114] (*See* Tr. 68–73 (Ms. Y.'s attorney's cross-examination of the expert); Comm'r's Br. 12, Doc. No. 21.)

[115] (*See* Tr. 74 (ALJ's statement indicating he would hold the record open after the hearing for Ms. Y.'s attorney to provide "objective support" for the limitations he asked the vocational expert about during cross-examination); Comm'r's Br. 12, Doc. No. 21.)

[116] (*See* Opening Br., Doc. No. 12 at 3, 17–18.)

[117] *Dictionary of Occupational Titles* (4th ed. 1991) (DOT) 209.687-026, 1991 WL 671813 (mail clerk).  The housekeeping cleaner and office helper jobs require only level-one and level-two reasoning, respectively.  *See* DOT 323.687-014, 1991 WL 672783 (cleaner, housekeeping); DOT 239.567-010, 1991 WL 672232 (office helper).

[118] 395 F.3d 1168 (10th Cir. 2005).

Circuit found a limitation to simple and routine work tasks "inconsistent with the demands of level-three reasoning."[119]

It is unnecessary to decide whether the ALJ erred in finding Ms. Y. capable of the mail clerk job. Even if he erred, an erroneous inclusion of jobs is harmless where the claimant can perform a significant number of other jobs in the national economy.[120] As explained above, Ms. Y. has demonstrated no error in the ALJ's finding that she could work as an office helper (43,000 jobs nationally) and a housekeeping cleaner (390,000 jobs nationally).[121] The number of available jobs in the national economy for these two positions exceeds the 152,000 jobs the Tenth Circuit has found sufficient for harmless error.[122] Therefore, any error by the ALJ in relying on the mail clerk job was harmless.

## CONCLUSION

The Commissioner's decision is affirmed.

DATED this 30th day of March, 2026.

BY THE COURT:

_____
Daphne A. Oberg
United States Magistrate Judge

---

[119] *Id.* at 1176.

[120] *See Evans v. Colvin*, 640 F. App'x 731, 736 (10th Cir. 2016) (unpublished); *Raymond v. Astrue*, 621 F.3d 1269, 1274 (10th Cir. 2009).

[121] (Tr. 31.)

[122] *See Stokes v. Astrue*, 274 F. App'x 675, 684 (10th Cir. 2008) (unpublished) (finding harmless error where 152,000 jobs were available nationally).